JAMES S. MEREDITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Meredith v. Commissioner
Docket Nos. 9797-76, 202-78.
United States Tax Court
T.C. Memo 1985-170; 1985 Tax Ct. Memo LEXIS 462; 49 T.C.M. (CCH) 1161; T.C.M. (RIA) 85170; April 4, 1985. Hallison H. Young and Frederick *463 A. Patmon, for the petitioner. F. Michael Kovach, Jr., for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Docket No.
Year
Deficiency
Sec. 6653(b) [1]
9797-76
1971
$10,274.07
$5,137.04
1972
407,862.53
203,931.27
202-78
1973
198,472.50
The issues for decision are (1) whether petitioner had unreported income for the taxable years 1971 and 1972, as determined by respondent by use of the net worth expenditures method of reconstructing his income; (2) whether respondent erred in disallowing various deductions claimed by petitioner with respect to Pallister Plaisance Limited Dividend Housing Association and Running M Cattle Company, two partnerships in which petitioner was a limited partner during 1972 and 1973; (3) whether petitioner is liable for an addition to tax for fraud under section 6653(b) for his 1971 and 1972 taxable years; and (4) whether the statute of limitations bars assessment and collection of the deficiency and addition to tax sought for petitioner's 1971 taxable year. [2]
*464 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Belleville, Michigan when the petition in docket No. 9797-76 was filed; he was confined in the Federal Penitentiary in Leavenworth, Kansas, when the petition in docket No. 202-78 was filed. During the years in issue, petitioner was married to Evelyn J. Meredith (Mrs. Meredith). For each of the taxable years 1971, 1972, and 1973, petitioner and his wife filed separate Federal income tax returns (Forms 1040), electing the married filing separately status. Petitioner's 1971 and 1973 tax returns (Forms 1040) were timely filed. Petitioner's 1972 tax return was not received by the Internal Revenue Service until August 3, 1973. See n. 14, infra.
Beginning as early as 1963, petitioner was employed as a truck driver. He worked as a trucker for numerous companies during the period of 1963 to 1970, including the Wolpin Company, the Levy Company, Eagle Trucking Company, Selective Transport Corporation, and Alsar Manufacturing Company. During the entire period of 1966 to 1970, Mrs. Meredith *465 was a school teacher, being employed by several different schools. For taxable years 1966 through 1970, inclusive, petitioner and his wife filed joint income tax returns (Forms 1040). For taxable year 1966, they reported a combined gross income of $16,484.62. Of this total amount, the sum of $10,944.36 represented petitioner's earnings as a truck driver. For taxable year 1967, they reported a combined gross income of $17,598.25. There is no indication in the record as to what portion of this total represented petitioner's earnings as a truck driver for that year. For taxable year 1968, they reported a combined gross income of $13,271.25. Again the record does not show what portion of this total represented petitioner's earnings as a truck driver for that year. For taxable year 1969, they reported a combined gross income of $17,963.46. Of this total gross income, $6,228.62 represented amounts paid to petitioner as a truck driver for the Crawford Door Company; $11,734.84 represented amounts paid to Mrs. Meredith as a school teacher by the Westwood Community School. For taxable year 1970, they reported a combined gross income of $17,586.76. Of this total gross income, $5,269.23 *466 represented amounts paid to petitioner as a truck driver for the Celotex Corporation; $12,317.53 represented amounts paid to Mrs. Meredith as a school teacher by the Westwood Community School. Petitioner prepared the joint income tax returns (Forms 1040) for each of the taxable years 1966 through 1970, inclusive. During the period 1966 through 1970, inclusive, petitioner and Mrs. Meredith had no gross income other than the amounts shown on their tax returns for such years, primarily their wages with just a few dollars of interest income. From 1965 through the latter part of 1972, inclusive, petitioner and his wife resided in their home at 2389 Springhill Place in Inkster, Michigan. This home and underlying land constituted the only realty owned by petitioner prior to 1972 and that property was subject to a mortgage in an undisclosed amount. During the years 1966 through 1970, inclusive, petitioner and Mrs. Meredith owned two cars, a Volkswagen and a Buick. Petitioner and Mrs. Meredith borrowed the money used to purchase these cars and made payments on such loans during 1966 through 1970, inclusive. They may have traded the Buick for a new car at sometime in 1969, but if such *467 a trade did occur, the new car was also purchased with borrowed funds. During the years 1962 through 1970, inclusive, petitioner and Mrs. Meredith frequently borrowed amounts ranging up to $2,000 in order to consolidate their debts and to obtain the necessities of everyday life. These loans were obtained from various loan companies. The history of a loan obtained from G.A.C. Finance, Inc. (GAC) is illustrative. Petitioner and Mrs. Meredith applied for and received a loan from GAC on November 2, 1962, in the amount of $500, the purpose of the loan being to consolidate their debts. On October 7, 1963, they obtained a renewal loan of $1,000 from GAC to meet their living expenses. Another renewal loan of $204.72 was obtained on October 2, 1964, and used to pay travel expenses. An additional renewal loan in the amount of $514.22 was obtained from GAC on January 25, 1965 and used to pay bills. On February 1, 1966, they received an additional loan of $150 which was likewise used to pay bills. The outstanding balance of the loan as of that date was $615.75. On October 13, 1969, they received a loan of $100 from GAC so that they might have some "extra" cash. This loan brought the *468 then outstanding balance to $597.88 as of that date. The outstanding balance as of December 31, 1969 was $573.83; as of December 31, 1970, $459.68; and as of December 31, 1971, $251.15. The outstanding balance of the loan was paid in full on September 5, 1972. Petitioner and his wife did not receive any loans from either James C. Meredith (the senior Mr. Meredith), petitioner's father, or from Jay Gholson (Mr. Gholson), petitioner's father-in-law, during the period 1960 through 1970, inclusive. Nor did petitioner or his wife lend either the senior Mr. Meredith or Mr. Gholson any money during this period.The father-in-law was a postal employee and had no money to lend. On a few occasions, petitioner and his father gave each other $100 to $200 but these were considered gifts rather than loans. Petitioner never gave any money to his father-in-law. Petitioner did not give his father any large sums of money during this period, and frequently indicated to his father that he needed money. The senior Mr. Meredith did not give petitioner any large sums of money during this time period, but in addition to the small gifts of money to his son, he did allow petitioner to charge items *469 on his credit cards from time to time. The record does not indicate the frequency or amount of any such charges on the father's credit cards. Beginning sometime in 1971, petitioner's money problems seemed to have mysteriously vanished and he entered a period in which he made substantial investments and acquired numerous assets. [3] In October of 1971, petitioner subscribed to purchase 100 shares of stock in Many Ventures, Inc. (Many Ventures), for a stated purchase price of $50 per share, totalling $5,000. Petitioner made a cash payment of $2,000 leaving an outstanding balance of $3,000. During 1972, petitioner made numerous installement payments totalling $1,139.14 toward his outstanding liability. As of December 31, 1972, petitioner had paid a total of $3,139.14, leaving an outstanding balance of $1,860.86. The senior Mr. Meredith *470 was the president of Many Ventures, as well as a shareholder therein. The record does not reveal the total number of shares owned by the senior Mr. Meredith. Petitioner never discussed the operations of Many Ventures with his father in any detail. [4]
On or about November 1, 1971, petitioner purchased a horse named Doty's Diane from Richard Forbush (Forbush) for $936. Petitioner also purchased a horse trailer from Forbush on or about the same date for $2,184. Petitioner paid cash for both the horse and the trailer. Petitioner purchased the horse trailer in Many Ventures' name. Forbush had been informed that petitioner did business under the name of Many Ventures. Doty's Diane was not immediately removed from Forbush's stables and boarding fees were incurred which petitioner likewise paid in cash. During 1972, petitioner purchased additional horses and equipment *471 from Forbush. In February of 1972, petitioner purchased two horses from Forbush: a stallion named Vanzie Parr for $3,000, and a mare named Wannago Straw for $1,500. During August of 1972, petitioner purchased a six-horse Miley trailer from Forbush for a price of $7,550. The trailer was a "gooseneck-type" trailer, and was the most expensive type of trailer made at the time of the purchase. Petitioner paid for both horses and the trailer with cash. Both horses and the trailer were purchased in Many Ventures' name. In addition, petitioner also paid Forbush a total of $2,310.95 for training and boarding fees in 1972, also in cash. No additional horses were purchased from Forbush. Forbush had no personal knowledge of any horses petitioner owned other than those purchased from him, but petitioner occasionally told Forbush of other horses he owned. A financial statement prepared for petitioner, reflecting assets owned as of December 31, 1972, indicates that petitioner owned a total of 25 horses on that date, with a purported cost of $177,250 and an estimated value of $237,300. These figures include the horses purchased from Forbush. Petitioner also told Forbush of a ranch he owned *472 in Texas, but did not mention many specific details concerning the ranch. During 1972, petitioner purchased a new home from David Apel (Apel). The house was located at 44233 Harmony Lane in Belleville, Michigan (the Harmony Lane property). The Harmony Lane property was a lake-front home consisting of approximately seven rooms, a tennis court, and a swimming pool. Petitioner's former residence at 2389 Springhill Place was also retained, rather than being sold. The first conversations concerning the purchase of the Harmony Lane property occurred between Apel and Mrs. Meredith. Subsequent conversations occurred involving both petitioner and his wife, and also included John Patterson, an agent of Patterson Realty Company, which represented petitioner as the realtor in the transaction. The original purchase offer was made on May 7, 1972, listing James C. Meredith, petitioner's father, as the purchaser and Patterson Realty Company as the realtor. Apel would not accept this purchase offer because he did not think it was the "right thing." Specifically, he did not approve of James C. Meredith being listed as the purchaser, when James S. Meredith was the actual purchaser. *473 A subsequent offer of purchase and agreement of sale, listing petitioner and his wife as the purchasers, was accepted by Apel and executed on May 7, 1972. The agreement covered the land, house, and all personal property located therein. The total purchase price was $150,000, which included the assumption of an outstanding mortgage on the house held by the Equitable Assurance Company with an outstanding balance of $52,096 as of the date the agreement of sale was executed. The purchase agreement also called for a cash deposit of $3,500, which was paid in the form of a check. Apel did not recall whether the check was drawn on an account in petitioner's name or in the name of the realtor. The terms of this agreement of sale were identical to those contained in the earlier offer of purchase made in James C. Meredith's name and rejected by Apel. The closing statement with respect to the Harmony Lane property was executed on May 20, 1972. After the addition of several costs as credits to the seller and reduction of this amount by petitioner's cash deposit and the outstanding mortgage balance, the closing statement listed a balance due of $94,735.43. Petitioner subsequently *474 decided he no longer desired the personal property contained in the house and purchased therewith and agreed to reconvey such personal property to Apel for the sum of $25,000. Petitioner paid the remaining balance of the purchase price, $69,735.43, in cash. The record does not indicate that petitioner borrowed the money used to complete the purchase.Apel and his wife conveyed the Harmony Lane property to petitioner and Mrs. Meredith by a warranty deed dated May 19, 1972. In addition to the Harmony Lane property, in 1972 petitioner also purchased Apel's interest in a certain land contract (the M-59 land). The M-59 land consisted of approximately 70 acres. The total sales price was $93,000, $35,311.60 of which was reflected in petitioner's assumption of Apel's outstanding liability under the land contract. Apel received the balance of the purchase price, $57,688.40. The record does not disclose whether or not that payment was made to Apel in cash. During 1972 Apel and petitioner also entered into an agreement whereby Apel agreed to lend a maximum amount of $150,000 to petitioner. Apel began making these loans at approximately the same time petitioner purchased the Harmony *475 Lane property. He advanced varying amounts of the money to petitioner as petitioner indicated he needed it. Apel kept a "tally" sheet indicating the amount of the particular disbursement to petitioner, but did not record the date thereof. Monies were advanced to petitioner throughout 1972 and in the early part of 1973, at which time petitioner's $150,000 credit limit was reached. On April 6, 1973, petitioner and Apel executed a negotiable promissory note in the amount of $150,000, representing petitioner's total indebtedness to Apel as of that date. The tally sheet which had previously been used as a record of petitioner's total indebtedness was destroyed. Other than the aforementioned promissory note, no records were kept which indicated the exact amount of petitioner's indebtedness to Apel as of any given date. [5]
*476 During the years in issue, Apel was also involved with petitioner in connection with three entities known as A & M Builders, Inc., BJD Productions, Inc., and Running M Ranches. The record does not reveal the nature or extent of Apel's involvement with these entities, but his stock in these ventures was signed over to petitioner and were part of the total $150,000 that he loaned to petitioner in 1972 and 1973. On August 12, 1972, petitioner entered into a contract of sale with Philip L. Kleas and Lelah Kleas for the purchase of approximately 837 acres of land and all improvements (barns, residences, etc.) thereon and appurtenances thereto, such land being located near Gonzales, Texas (the ranch property). The terms of such contract provided for a total purchase price of $500,000 payable as follows: a $100,000 cash down payment, due upon closing of the agreement; assumption of an outstanding mortgage in the amount of $130,000 held by the John Hancock Life Insurance Company; and the execution of a $270,000 promissory note secured by a deed of trust in Kleas' favor, $170,000 of which was payable interest free on or before January 15, 1973, the balance of $100,000 payable in 20 equal *477 semiannual installments over the 10-year period following execution of the note. At the time the purchase agreement for the ranch property was executed, a copy thereof and an earnest money deposit of $100,000 were submitted to the Burchard Abstract Corporation as the escrow agent for the proposed sale. The $100,000 earnest money deposit was in the form of two cashier's checks in the amount of $50,000 each, payable to Philip and Lelah Kleas. These cashier's checks were purchased by petitioner's father and Apel with money provided to them by petitioner specifically for that purpose. [6] The earnest money deposit was used to make the down payment on the property. The outstanding John Hancock mortgage was also assumed by petitioner. As of December 31, 1972, there was an amount of $132,000 still outstanding on this mortgage. The promissory note called for by the purchase agreement was also subsequently executed by petitioner and Kleas. [7]
*478 On October 5, 1972, petitioner obtained a 90-day loan in the amount of $160,000 from Michigan National Bank. The loan proceeds were disbursed to petitioner in the form of a cashier's check drawn on the Michigan National Bank. This check was then endorsed over to Kleas by petitioner. [8] This loan was collateralized by petitioner's assignment of a $150,000 certificate of deposit to Michigan National Bank. That certificate of deposit had been purchased on October 5, 1972 in the name of Patmon, young, and Kirk, Professional Corporation (Patmon-Young), petitioner's attorneys. Petitioner had previously given Patmon-Young the money used to purchase the certificate of deposit. On november 2, 1972, petitioner obtained an additional 30-day loan in the amount of $25,000 from Michigan National Bank. The outstanding balance of the various Michigan National Bank loans as of December 31, 1972, including interest, was $188,046.70. The $25,000 loan was repaid by petitioner on January 5, 1973. The $160,000 loan was repaid by petitioner on January 25, 1973. *479 The certificate of deposit collateralizing the $160,000 loan was reassigned to petitioner and on March 6, 1973, petitioner redeemed the $150,000 certificate of deposit, receiving a check for the funds. The check in redemption of the certificate of deposit was credited to petitioner's account with Michigan National Bank. On October 19, 1972, petitioner borrowed $100,000 from the Gonzales Bank located in Gonzales, Texas. This loan was secured by 373 head of cattle petitioner had also purchased in 1972. The record does not disclose exactly what these loan proceeds were used for. As of December 31, 1972, petitioner had not made any payments, principal or interest, on the Gonzales Bank loan. In 1972, petitioner also invested in several enterprises. He invested $10,000 in an entity named Market Row Stables. The record contains no information concerning the nature of this entity or its activities. During 1972, petitioner purchased a limited partnership interest in Pallister Plaisance Limited Dividend Housing Association (Pallister), a limited partnership organized under the laws of the State of Michigan. From its inception in January of 1972 through December 31, 1973, Pallister *480 was engaged in the business of providing housing facilities to persons of law and moderate income. After petitioner purchased his limited partnership interest in Pallister, the general partners thereof were Paul Ringler and Eugene Nosar. The limited partners were petitioner, Paul Ringler, Eugene Nosar, and Lee Saperstein. Pursuant to the Amended Agreement and Certificate of Limited Partnership (Amended Agreement) dated November 17, 1972, petitioner agreed to make a total capital contribution of $550,000 to Pallister, $150,000 of which was due upon execution of the Amended Agreement; the outstanding balance of $400,000 to be paid in three subsequent installments of $87,500, $87,500, and $225,000, respectively. Petitioner's agreed upon contribution entitled him to a 96 percent interest in the partnership subject to the terms of the Amended Agreement. The Amended Agreement also provided for the forfeiture of a designated percentage of petitioner's limited partnership interest in the event he defaulted upon the future installments of his capital contribution. [9]
*481 Petitioner made the initial payment of $150,000 called for by the Amended Agreement on November 17, 1972. The payment was made in the form of a check drawn on Patmon-Young's trustee account, payable to Pallister. This check was deposited into Pallister's checking account. Pallister then drew a check in the amount of $50,000 payable to Eco Ventures, representing payment of miscellaneous expenses. The remaining $100,000 was distributed to Ringler, Nosar, and Saperstein in equal one-third shares as payment for their limited partnership interests purchased by petitioner. [10] On December 31, 1972, petitioner was obligated to make a capital contribution to Pallister in the amount of $400,000. *482 Petitioner remained a limited partner in Pallister for the rest of 1972 and throughout 1973. However, the percentage of his interest therein was reduced by his failure to make the subsequent installment payments as they became due, and as of February 2, 1974, petitioner had forfeited his entire limited partnership interest in Pallister. [11]
In 1972, petitioner invested in another limited partnership, Running M Cattle Company (Running M), which was formed in November of 1972. Running M was located in Gonzales, Texas. The general partner in Running M was the Running M Cattle Company, Inc., of which petitioner was the president. [12] The limited partners in Running M were petitioner, his father, and his father-in-law. In return for his limited partnership *483 interest, petitioner agreed to make a total capital contribution to Running M of $350,950, $35,950 of which was paid by petitioner in 1972. As of December 31, 1972, petitioner was obligated to contribute an additional $315,000 to Running M. Petitioner's investment in Running M entitled him to a 95 percent share of the partnership's profits and losses. [13]
In addition to the previously mentioned *484 expenditures for automobiles, motorcycles, cattle, and horses, petitioner made other substantial purchases in 1971 and 1972. He purchased a new 1972 Lincoln Continental Mark IV for approximately $10,000, approximately $6,500 of which was satified by the trade-in of a previously owned car (a 1971 Mark III), leaving $3,500 as the net purchase price which was apparently financed through the Ford Motor Company. Although petitioner paid for the car, title thereto was listed in Mrs. Meredith's name. He also purchased a 1972 Harley Davidson motorcycle for $3,275.78, which was paid in cash. A camper was purchased for approximately $3,500; a hydroboat for approximately $7,000. Petitioner also paid a total of $4,965.60 in cash for the installation of a mobile car telephone in each of two automobiles. In 1971, he also expended at least $1,240 to purchase clothes from a store known as Kosin's Clothes. During 1971 and 1972, petitioner also advanced various monies to Patmon-Young as prepaid legal expenses. The firm's client accounts allocated the total amount of the advances among client files pertaining to various business activities in which petitioner was engaged. As of December 31, 1972, the *485 amount of the prepaid regal expenses totalled $106,923.73. For taxable year 1971, petitioner prepared and timely filed a separate Federal income tax return (Form 1040), electing the married filing separately status. The return listed petitioner's occupation as a salesman. For a period of time in 1971, petitioner was employed by his father, a district manager of the Equitable Life Assurance Society (Equitable Life), as a salesman for Equitable Life. Petititioner's return reported a total gross income of $10,051.03. The amount of $2,051.03 thereof represented wages paid to petitioner by Equitable Life. The return provided no information concerning the source of the remaining $8,000 reported as gross income for the year. Petititioner did not receive any gifts or inheritances during 1971. For taxable year 1972, petitioner again filed a separate Federal income tax return (Form 1040), also electing the married filing separately status, but claiming a personal exemption for his wife on the return. Petitioner's 1972 return was prepared by Patmon-Young and was timely filed with the Internal Revenue Service Center in Austin, Texas, on July 30, 1973. [14]
*486 The Schedule C (Profit or Loss From Business or Profession) attached to petitioner's 1972 return reported the amount of $622,049 as both his gross and net business income. The Schedule E (Supplemental Income Schedule) attached thereto claimed the amounts of ($319,811) and ($73,412) as his partnership losses for the year, for a total loss of ($393,223). On the Schedule F (Farm Income and Expenses) attached to his return, petitioner claimed a net farm loss in the amount of ($152,259). Reducing his total reported business income, $622,049, by the amount of his total claimed losses ($545,482), petitioner arrived at the figure of $76,567, which he reported as his total taxable income for 1972. Petitioner received no gifts or inheritances during 1972. In no portion of his 1972 return did petitioner disclose any specific information concerning the computation of his reported income and loss figures, instead choosing to disclose only the total amounts thereof. Whenever any specific information was required by the return or the schedules attached thereto, reference was made to either Note 1 or Note 2, or both. Notes 1 and 2 were on a separate sheet attached to petitioner's return *487 and provided as follows: Note 1 Taxpayer avails himself of the privilege afforded him under the Fifth Amendment of the Constitution of the United States of America and respectfully declines to answer this question on the ground that the answer may tend to incriminate him. Note 2 The amount of income was computed by the cash receipts and expenditures method of accounting from information available only at the time of preparing the return. Additional information and data may increase or decrease the amount of income, and if such event occurs, an amended return will be filed, if necessary. For his 1973 taxable year, petitioner once again filed a separate Federal income tax return (Form 1040), again electing the married filing separately status and again claiming a personal exemption for his wife. Petitioner's 1973 return was also prepared by Patmon-Young, and was timely filed with the Internal Revenue Service Center in Cincinnati, Ohio on October 15, 1974, pursuant to an extension of time within which to file. The Schedule C attached to petitioner's 1973 return reported the amount of $393,560 as both his gross and net business income. The Schedule E listed the amounts *488 of ($116,455) and ($100,540) as his losses from Pallister and Running M, respectively, producing total claimed partnership losses of ($216,995). The Schedule F reported a net farm loss in the amount of ($177,775). Petitioner also claimed a separately stated section 1231 loss of ($99,865) which was also somehow related to Running M. Reducing his total reported income, $393,560, by the amount of his total claimed losses ($494,635), petitioner arrived at the figure of ($101,075), which he reported as his total loss for 1973. As with his 1972 return, in no portion of his 1973 return did petitioner disclose any specific information concerning the computation of his reported income and loss figures, instead choosing to disclose only the total amounts thereof. Whenever any specific information was required by the return or the schedules attached thereto, reference was made to either Note 1 or Note 2, or both. Notes 1 and 2 were on a separate sheet attached to petitioner's 1973 return, and were verbatim recitations of those attached to petitioner's 1972 return. Pallister's 1972 partnership return (Form 1065) was prepared by the accounting firm of Coopers and Lybrand and signed for *489 the partnership by Paul Ringler, the general partner (hereinafter referred to as the 1972 Ringler return). The 1972 Ringler return reported a total loss for Pallister in the amount of ($170,258). This total consisted of two items: a loss from rental expenses in the amount of $84,321 and a claimed interest deduction of $85,937 on a mortgage obtained by the partnership in connection with their housing activities. On a supplemental schedule attached to the 1972 Ringler return, the rental loss of ($84,321) was further broken down into the following components: Mortgage insurance premium
$18,626
F.H.A. examination fee
5,973
Financing fee
59,722
Total
$84,321
A Schedule K-1 attached to the 1972 Ringler return showed petitioner as entitled to 96 percent of the partnership's profits or losses for the year, and accordingly allocated the amount of ($163,447) to petitioner as his distributive share of Pallister's losses for 1972. Apparently there was some dispute between petitioner and the other partners as to the treatment of certain items on the 1972 partnership return. In any event, petitioner caused to be filed a partnership return (Form 1065) on Pallister's *490 behalf for 1972 (hereinafter petitioner's 1972 Pallister return). This partnership return was prepared by Vasel E. Glass Professional Corporation (Glass) and signed by petitioner. Petitioner's 1972 Pallister return reported a total partnership loss of ($333,136). The return claimed a $90,000 deduction for salary payments to partners. See n. 10, supra. In addition, the return claimed a total of $243,136 as miscellaneous deductions, consisting of the following claimed expenses: Interest
$ 85,937
Financing fees--construction loan
83,217
Supervisory & Management fees
50,000
Insurance on construction loan
19,649
Property taxes
4,333
$243,136
A Schedule K-1 attached to the return showed petitioner as entitled to 96 percent of the Pallister's profits and losses, and accordingly allocated the amount of ($319,811) to petitioner as his distributive share of partnership losses for the year. It was this ($319,811) loss shown as petitioner's distributive share of the loss on petitioner's 1972 Pallister return which petitioner claimed on his 1972 individual income tax return (Form 1040). Patmon-Young prepared Running M's 1972 partnership return (Form 1065), *491 which was then signed by petitioner and filed with the Internal Revenue Service Center in Austin, Texas, on July 30, 1973. [15] Running M's 1972 return showed a loss in the amount of ($75,170), consisting of the following items: Interest (Income)
$ 2,953 Interest (Deductions)
(3,369)
Depreciation
(59,286)
Maintenance Fees
(13,125)
Professional Fees
(2,343)
$ (75,170)
The claimed depreciation deduction was attributable to a herd of cattle listed on the partnership return as having a basis of $421,000 and depreciated under the double declining balance method using a seven-year useful life. A Schedule K-1 attached to the partnership return showed petitioner as entitled to 95 percent of the partnership's profits or losses, and accordingly, allocated ($71,412) to petitioner as his distributive share of Running M's losses for 1972. The Schedule K-1 also allocated $2,000 of additional first-year depreciation to petitioner. Petitioner reported both the $2,000 additional first-year depreciation and his ($71,412) distributive share of losses from Running M on his 1972 individual tax return (Form 1040), for a total loss of ($73,412) with respect to Running M *492 for 1972. Ringler, as general partner, again filed a partnership return (Form 1065) for Pallister's 1973 taxable year (hereinafter the 1973 Ringler return). The return was once again prepared by the accounting firm of Coopers and Lybrand, and signed by Ringler. This return reported $7,426 of miscellaneous income and total losses of ($245,226), for a net loss of ($237,800). This total consisted of two items: mortgage interest in the amount of ($157,426); and ($87,800) representing the excess of Pallister's operating expenses, depreciation, and repairs over the yearly rental income for apartment rental units. [16] A Schedule K-1 attached to the 1973 Ringler return showed petitioner as entitled to 48 percent [17] of Pallister's losses for 1973, and accordingly, the sum of ($166,056) was allocated to petitioner. *493 Petitioner again caused to be filed a separate partnership return (Form 1065) for Pallister's 1973 taxable year (hereinafter petitioner's 1973 Pallister return). The return was prepared by Glass and signed by petitioner. The following statement was attached thereto: This return, including accompanying schedules and statements, is prepared based upon all available information, data, and knowledge and belief. Taxpayer, to no avail, made repeated requests of the General Partners to make available certain books, records and other financial data relative to the partnership. Therefore, the data contained herein is based upon the Cost Certification Report and other data annualized to reflect the estimated costs, revenues and expenses for the calendar year ended December 31, 1973. When the information becomes available, an amended return will be prepared and filed with the proper authorities. Petitioner's 1973 Pallister return reported total income in the amount of $198,506. The return also claimed total deductions in the amount of $629,818. This total amount of deductions consisted of the following components: Salaries and wages (other than to partners)
$ 7,748
Interest on mortgage
171,511
Taxes
60,546
Depreciation
237,119
Other deductions
152,894
$629,818
*494 On a separate schedule attached to the return, the "other deductions" were broken into the following components: Financing and inspection fees
[18] $857,621
Marketing fees
19,856
Maintenance services
11,906
Insurance - construction
8,733
Insurance - general
5,962
Professional fees
5,319
Management fees
4,665
Material and supplies
2,629
Utilities
2,309
Office supplies & expenses
2,044
Advertising
1,515
Signs
1,134
Motel accessories
763
Credit fees
223
Exterminating
74
$152,894
Reducing the total reported income, $198,506, by the total claimed deductions, $629,818, results in a net loss for the year of ($431,312), which was reported on petitioner's 1973 Pallister return. A Schedule K-1 attached thereto showed petitioner as entitled to 27 percent of Pallister's profits or losses for the year, and accordingly, allocated the amount of ($116,455) to petitioner as his distributive share of the partnership's losses for the year. [19] On his 1973 individual return (Form 1040) petitioner reported the ($116,455) loss shown on petitioner's 1973 Pallister return as his distributive share of Pallister's losses for the year. *495 Running M's 1973 return (Form 1065) was not introduced into evidence by either party. However, on his 1973 individual tax return (Form 1040), petitioner claimed an ordinary loss in the amount of ($100,540) attributable to Running M. [20]
An investigation into petitioner's tax liabilities was begun in August of 1972. As a result of an investigation concerning some other taxpayer, Special Agent Tom Williams became aware of petitioner's new Continental Mark IV car and affluent lifestyle. Further observations raised suspicions concerning petitioner's financial affairs. Shortly thereafter, Special Agent Williams requested and received petitioner's tax returns (Forms 1040) for taxable years 1966 through 1971, inclusive, in order to determine whether petitioner's observed affluent lifestyle comported with the financial information reported on petitioner's tax returns. After a review of these returns, Special Agent *496 Williams contacted petitioner in December of 1972. Special Agent Williams informed petitioner of his position with the Criminal Intelligence Division of the Interal Revenue Service (the Service) and the purpose of his visit. He also informed petitioner of his Fifth Amendment rights. Petitioner indicated he understood those rights and declined to make any statements or answer any questions, instead referring Special Agent Williams to Frederick A. Patmon, petitioner's tax attorney. Special Agent Williams did not receive any records concerning petitioner's financial activities from petitioner at this meeting, or at any subsequent time. Special Agent Williams then contacted Mr. Patmon, who referred him to James Feaster, the attorney for the Patmon-Young firm who at that time was directly involved in representing petitioner. From that point on, Special Agent Williams dealt primarily with Mr. Feaster. [21]
During the course of his investigation, Special Agent Williams had numerous contacts with Mr. Feaster, both by telephone and in person. During *497 these conversations, Special Agent Williams asked Mr. Feaster for books and records of petitioner's income-producing activities for taxable years 1970, 1971, and 1972, but no such records were ever produced. In discussing the preparation of petitioner's 1972 and 1973 returns, Mr. Feaster told Special Agent Williams that he had used an indirect method of calculating petitioner's income, a type of net worth method using Mr. Feaster's own personal techniques. Mr. Feaster told Special Agent Williams he had used various records provided to him by petitioner in preparing his returns, including cancelled checks, bank statements, invoices, receipts, and paid bills. However, no formal books and records, such as general ledgers or journals, were used. When asked for the records utilized in computing petitioner's taxable income for 1972 and 1973, both Mr. Feaster and Mr. Patmon informed Special Agent Williams that such records had been returned to petitioner. At no time during the course of his investigation were any such records made available to Special Agent Williams by Mr. Patmon, Mr. Feaster, or petitioner. Special Agent Williams then began trying to locate financial information concerning *498 petitioner through indirect sources. Analysis of petitioner's tax returns revealed several companies and financial institutions petitioner had dealt with, and these firms were contacted in order to obtain information concerning petitioner's financial affairs. Petitioner's telephone records were obtained from the telephone company and examination thereof identified additional entities with which petitioner had dealt. In addition to the telephone company, various other utility companies were contacted seeking information concerning petitioner. Petitioner's previous employers were contacted, as well as numerous loan companies from which petitioner had borrowed money. Summonses requesting all available records were sent to those banking institutions which petitioner's returns revealed he had dealt with. In addition, for a brief period a "mail cover" was placed on petitioner's residence through which Special Agent Williams was able to learn the names of various banks from which petitioner received mail. Special Agent Williams also contacted numerous individuals, including petitioner's father, father-in-law, Apel, and Forbush, and questioned them concerning petitioner's finances and *499 their business dealings with petitioner. Summonses were also issued to several of these individuals requesting any documents they had pertaining to petitioner. During the course of his investigation, Special Agent Williams also obtained copies of petitioner's 1972 and 1973 Pallister returns and Running M's 1972 and 1973 returns. In addition, Special Agent Williams obtained copies of various financial statements concerning petitioner, Pallister, and Running M for 1972-1973. Information concerning petitioner's prepaid legal expenses was furnished to Special Agent Williams by Mr. Patmon. Special Agent Williams contacted the accountant for various entities with which petitioner was financially involved in order to obtain documentation concerning such financial activities. During the course of his investigation, Special Agent Williams followed all leads with respect to petitioner's income and liabilities and with respect to any nontaxable sources of income petitioner may have had. His investigation disclosed no gifts, inheritances, or other nontaxable sources of income. Using the information obtained from his investigation of petitioner's financial affairs, Special Agent Williams *500 utilized the net worth expenditures method (net worth) to reconstruct petitioner's income for 1971 and 1972. Several aspects of Special Agent Williams' computations will be discussed below. First, no specific amount of cash on hand was listed for 1970, the opening year of the net worth, or for 1971 and 1972, the years for which the amount of income was in dispute. As a result of information obtained during his investigation, specifically petitioner's employment history, the recurrence of numerous small loans utilized to pay living expenses and the lack of any gifts or inheritances, Special Agent Williams concluded that petitioner had an insignificant amount of cash on hand as of December 31, 1970. A dash was entered on the net worth schedule for taxable year 1970 to indicate the presence of an insignificant amount of cash on hand as of the close of the year. A dash was also entered for cash on hand with respect to petitioner's 1971 and 1972 taxable years to reflect either that an amount of cash on hand was insignificant or that the amount of cash was unchanged. In fact, Special Agent Williams believed that petitioner's cash on hand had increased substantially in 1971 and 1972, *501 but he continued to use the dash for purposes of consistency and thereby showed no increase in cash on hand in 1971 and 1972. In computing petitioner's personal expenditures for the years 1970 through 1972, Special Agent Williams did not use Department of Labor statistics or estimates, instead trying to compute actual expenditures from the information available to him. Further, substantial legal fees were paid by petitioner in 1971 and 1972. Special Agent Williams treated such amounts as business expenses; thus the legal fees were not included as personal expenditures. In computing the amount of loans payable by petitioner as of December 31, 1972, Special Agent Williams included only $60,000 of the total $150,000 ultimately loaned to petitioner by Apel before April 6, 1973. When interviewed in 1974, Apel had told Special Agent Williams that the outstanding balance of the loan as of December 31, 1972 was $60,000; Apel related this amount to certain events corroborating such amount.Further, Apel said he was fairly certain of the amount since at that time less than two years had passed since the loans were made. [22]
*502 Special Agent Williams also did not include petitioner's outstanding obligations to make additional capital contributions to Pallister and Running M in the amount of $400,000 and $315,000, respectively, as separately-stated liabilities during 1972. Instead of listing the full amount of petitioner's capital contribution obligation as separate assets and the full amount of the outstanding balance of such obligation as separately-stated liabilities, Special Agent Williams reduced the amount of the total capital contribution obligations by his outstanding liabilities thereon, plus petitioner's distributive share of the partnerships' losses for the year, and this single net figure for each partnership was listed as an asset in the net worth schedule. Petitioner's 1972 Pallister return and Running M's 1972 return were used to determine petitioner's distributive share of the losses of each partnership for the year. [23] The methodology used by Special Agent Williams is a proper accounting method. *503 Based upon his net worth computations, Special Agent Williams concluded that petitioner had substantial unreported income for both his 1971 and 1972 taxable years. He informed Mr. Feaster of his conclusions and asked for any additional information which Mr. Feaster thought should be considered. Despite Mr. Feaster's indication that additional pertinent information existed, no such information was ever produced. The decision was subsequently made not to institute criminal fraud proceedings against petitioner. Instead, the case was turned over to Revenue Agent William Bangela, who had been the cooperating revenue agent with Special Agent Williams, to pursue civil tax proceedings against petitioner. In preparing his revenue agent's report concerning petitioner's 1971 and 1972 taxable years, Agent Bangela adopted most of the information obtained by Special Agent Williams as true and correct.The majority of his conclusions were based on documents and other information contained in the administrative file concerning petitioner that had been developed during the criminal investigation. However, Agent Bangela made some changes with respect to Special Agent Williams' net worth computation, *504 which will be discussed below. First, in computing petitioner's personal expenditures for 1972, Agent Bangela treated the substantial legal expenses paid by petitioner during that year as personal expenses, rather than business expenses as Special Agent Williams had done. Thus, petitioner's personal expenditures for 1972 were increased by the amount of such legal expenses. Second, Agent Bangela did not give petitioner the "benefit of the doubt" concerning the validity of petitioner's 1972 Pallister return. Based on his examination of both 1972 Pallister returns--including discussions with Ringler, the general partner, an examination of certain partnership records concerning Pallister, and other third-party information--Agent Bangela accepted the 1972 Ringler return as correct, instead of giving petitioner the "benefit of the doubt" by accepting petitioner's 1972 Pallister return as true. Agent Bangela then disallowed all deductions shown on petitioner's 1972 Pallister return which either were not shown on the Ringler return or that exceeded in amount those shown on the 1972 Ringler return. Using petitioner's distributive share of Pallister's losses shown on the 1972 Ringler *505 return, Agent Bangela then calculated petitioner's investment in Pallister using the same accounting method as Special Agent Williams had used, listing the net amount of such investment as an asset in petitioner's net worth schedule for 1972. Application of such methodology resulted in petitioner having a deficit capital account of ($13,447) as of December 31, 1972. Agent Bangela also used essentially the same methodology used by Special Agent Williams to calculate petitioner's investment in Running M. However, unlike Special Agent Williams, Agent Bangela did not give petitioner the benefit of the doubt by accepting Running M's 1972 return as correct. Rather, Agent Bangela made two adjustments thereto which resulted in an adjusted partnership loss for the year.First, Agent Bangela determined that Running M had purchased certain cattle from petitioner within a short period of petitioner's purchase thereof and at a substantially-inflated price. [24] He treated such transaction as a sham and adjusted the partnership's cost basis to that of petitioner's actual cost, i.e. $160,000. This adjustment coupled with an adjustment in the cattle's useful life resulted in a lesser depreciation *506 deduction for 1972 than that originally claimed by Running M. [25] Incorporating petitioner's adjusted distributive share of Running M's loss for 1972 into his computation, Agent Bangela determined petitioner's capital account in Running M to be $26,429.16 as of December 31, 1972, which he included as an asset in petitioner's net worth schedule. Utilizing the information collected during Special Agent Williams' criminal investigation, and incorporating therein the various adjustments discussed above, Agent Bangela recomputed petitioner's income under the net worth method, *507 as summarized below: Assets:
12-31-70
12-31-71
12-31-72
Cash on hand
Cash in banks
605.56
551.64
149,558.70
Funds held in trust and
106,923.73
advance attorney fees
Notes Receivables: Running M Cattle Company
160,000.00
Selective Transport
1,000.00
1,000.00
Investments
2,000.00
25,895.68
Real Estate
10,700.00
10,700.00
732,534.29
Ranch Equipment
72,070.91
Race Horses
165,470.00
Other Depreciable Assets
3,120.00
9,851.00
Vehicles
14,787.79
10,692.02
17,892.19
Furniture
896.10
8,635.40
13,501.06
Other Assets
1,059.32
2,120.62
31,494.53
Total Assets
$29,048.77
$38,819.68
$1,485,192.03
Liabilities:
12-31-70
12-31-71
12-31-72
Loans Payable
$11,001.11 $ 8,803.93 $361,808.78
Mortgages & Notes Payable
18,265.56 18,084.46 503,450.43
Reserve for Depreciation: Ranch Property
885.94
Ranch Equipment
4,684.33
Race Horses
20,379.33
Other Property
173.33 1,873.75
Total Liabilities and
Reserve for Depreciation
$29,266.67 $26,995.72 $893,082.56
Net Worth:
(217.90)
11,823.96 592,109.47
Less: Beginning Net Worth
(217.90)
11,823.96
Net Worth Increase
12,041.86 580,285.51
Adjustments to Net Worth
18,750.92 77,390.59
Corrected Taxable Income
30,792.78 657,676.10
Taxable Income Per Return
6,256.74 72,567.00
Understatement of Taxable Income
$24,536.04 $585,109.10
*508 The above understatements of taxable income are composed of the following items: [26]
1971
1972
Additional Income
$25,883.87 $369,080.64 Increase in Itemized Deductions
(1,347.83)
(5,976.70)
Partnership Adjustments: Running M Cattle Company
63,891.16 Pallister Plaisance Limited Dividend
Housing Association
156,364.00 Exemption
750.00 Standard Deduction
1,000.00 Understatement of Taxable Income
$24,536.04 $585,109.10 As noted above, after discussions with Ringler, the general partner, examination of various books and records of the partnership and also discussions with representatives of Coopers and Lybrand, who had prepared the 1972 Ringler return, Agent Bangela concluded that the Ringler return correctly reported Pallister's income for 1972. He thus disallowed any deductions claimed *509 on petitioner's 1972 Pallister return to the extent such deductions either exceeded in amount or were not claimed on the 1972 Ringler return. [27] Further, with respect to Running M's 1972 return, Agent Bangela made such adjustments thereto as were necessary to reflect his changes in the partnership's claimed depreciation deductions discussed above. As a result of Agent Bangela's adjustments to petitioner's 1972 Pallister return and Running M's 1972 return, petitioner's distributive share of loss from the partnerships was reduced by the amounts of $156,364 and $63,891.16, respectively, such amounts being reflected in the statutory notice for 1972 as increases in petitioner's taxable income. These increases in petitioner's taxable income were separate from and in addition to the increases for unreported income determined by the net worth computation. *510 Agent Bangela also prepared the revenue agent's report pertaining to petitioner's 1973 taxable year. No reconstruction of petitioner's income using the net worth method for taxable year 1973 was performed. Instead, the deficiencies determined with respect to petitioner's 1973 taxable year arose solely from the disallowance of claimed deductions for such year. With respect to Pallister, after examination and discussions similar to those undertaken with respect to Pallister's 1972 taxable year, Agent Bangela once again concluded that the 1973 Ringler return was correct, and disallowed any deductions on petitioner's 1973 Pallister return that were either not claimed on the Ringler return or that exceeded in amount those claimed on the 1973 Ringler return. With respect to Running M's 1973 return, Agent Bangela again made adjustments to the claimed depreciation deductions and disallowed in full a claimed interest deduction. [28] As a result of Agent Bangela's adjustments to petitioner's 1973 Pallister return and Running M's 1973 return, petitioner's distributive share [29] of losses from the partnerships were reduced by the amounts of $68,848.95 and $75,375.14, such amounts being reflected *511 as increases in petitioner's taxable income for 1973 in the statutory notice pertaining to that year. By a statutory notice mailed July 30, 1976, respondent determined *512 that petitioner had unreported income for his 1971 and 1972 taxable years and had underpaid his taxes, and that such underpayment was due to fraud within the meaning of section 6653(b). Respondent also disallowed a portion of petitioner's claimed losses with respect to two partnerships, Pallister and Running M, for 1972. By a separate statutory notice mailed on October 3, 1977, respondent also adjusted petitioner's claimed losses in Pallister and Running M for 1973 and disallowed various other losses and deductions for that year. In 1977, a six-count indictment against petitioner and other named defendants was returned by the Grand Jury for the United States District Court for the District of New Jersey (sitting at Newark), charging petitioner with conspiracy to violate and violation of numerous Federal narcotics laws from as early as October 1, 1972. On September 9, 1977, a verdict was entered against petitioner by the United States District Court for the District of New Jersey on Counts I, II, and III of the indictment, namely conspiracy to violate Federal narcotics laws; conspiracy to import heroin, a schedule 1 controlled substance; and distributing and causing to be distributed *513 heroin. ULTIMATE FINDINGS OF FACT 1. Petitioner underreported his taxable income and underpaid his taxes for each of the years 1971 and 1972. 2. The underpayment of tax for the year 1972 was due to fraud with the intent to evade taxes. 3. Respondent has not carried his burden of proof to establish fraud by clear and convincing evidence for the year 1971. 4. Petitioner has not carried his burden of proof to establish error in the deficiency determined for the year 1973. OPINION I. Unreported Income for 1971 and 1972
Utilizing the net worth expenditures method, respondent determined that petitioner had unreported taxable income in the amounts of $25,883.87 and $369,080.64 for the years 1971 and 1972, respectively. The net worth expenditures method is an acceptable mechanism for testing the accuracy of a taxpayer's tax returns, but its use requires the exercise of "great care and restraint." Hollandv. United States,348 U.S. 121, 129 (1954). The net worth *514 expenditures method is not an accounting system, but rather, when properly applied, is evidence of income. Holland v. United States,supra at 130, 133; Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F. 2d 871 (4th Cir. 1955). In a case such as this, where the determination of unreported income as well as the existence of fraud necessary to lift the bar of the statute of limitations (for taxable year 1971) depends upon respondent's net worth computation, we must examine the validity of respondent's computation in light of the standards set forth by the Supreme Court in Holland v.United States,supra, and United States v. Massei,355 U.S. 595 (1958). There are two prongs to those standards. Under those standards, respondent must first establish, with reasonable certainty, an opening net worth. That is the first prong. The second prong is in the alternative. For that, he must establish either that a likely source of unreported income existed, or that he conducted a reasonable investigation *515 of leads to negate the existence of nontaxable sources of income. Petitioner's objections to respondent's net worth computation are few. He first attacks respondent's failure to include any amount of cash on hand in his net worth computations for either 1970, 1971, or 1972. Instead of listing an amount of cash on hand for 1970, the opening net worth year, respondent inserted a dash into the net worth schedule to indicate that petitioner had an insignificant amount of cash on hand as of December 31, 1970. We think the record amply supports such conclusion. During the years 1962 through 1970, petitioner obtained numerous loans in varying amounts from several loan companies, utilizing the loan proceeds to meet everyday living expenses of petitioner and his wife. Further, the joint income of petitioner and his wife was modest during this period of time. There were no gifts or inheritances during this time period that could have generated any significant amount of cash on hand. In short, under these facts, we think respondent was amply justified in concluding that petitioner's cash on hand was insignificant as of December 31, 1970. To render the treatment of cash on hand consistent *516 for 1971 and 1972, respondent's agents again entered a dash in the column for this asset, even though they believed that petitioner's cash on hand had in fact substantially increased during both years. Petitioner objects to this treatment, especially with respect to taxable year 1972. Relying on an unaudited financial statement prepared for petitioner which reported that as of August 31, 1972 petitioner had $150,000 cash on hand, petitioner contends that his cash on hand for 1972 should be listed as $150,000. However, this particular financial statement was only one of several prepared for petitioner during 1972. None of these other financial statements list an amount of cash on hand, instead entering a dash beside this asset. Further, we note that between August 30, 1972 and December 31, 1972, petitioner made a $150,000 payment toward his total capital contribution obligation to Pallister, as well as numerous other investments and purchases. We think the conclusion is well taken that if petitioner did in fact have $150,000 cash on hand on August 31, 1972, that money and a great deal more had been spent by the end of 1972. Finally, even assuming that petitioner did have substantial *517 amounts of cash on hand during 1971 and 1972, respondent's exclusion thereof acts to petitioner's benefit, not to his detriment. Accepting that petitioner had no significant amount of cash on hand as of December 31, 1970, a substantial increase in his cash on hand during 1971 and 1972, absent offsetting liabilities, would only serve to increase petitioner's net worth and therefore increase the amount of his unreported taxable income. For all of these reasons, we find no error in respondent's treatment of cash on hand in the net worth computation. Petitioner next contends that respondent has understated his loans payable as of December 31, 1972. His allegations of error in this regard concern the amount of petitioner's indebtedness to Apel as of December 31, 1972, as well as respondent's failure to list as separate liabilities petitioner's outstanding obligations as of December 31, 1972 to make additional capital contributions to both the Pallister and Running M partnerships. With respect to petitioner's indebtedness to Apel, respondent's net worth computation listed the amount of such debt as $60,000 on December 31, 1972, and included that amount in his net worth computations. *518 At trial, Apel testified that he was sure that he had loaned at least $100,000 to petitioner by December 31, 1972. However, in earlier interviews during 1974 with respondent's agents, Apel had said the amount of such debt was $60,000, and he was sure of such amount due to the short lapse of time, less than two years, since such loans had been made. Further, Apel corroborated such amount by relating the loans to various events occurring during this time period. Based on these interviews, respondent's agents included $60,000 as loans payable to Apel. No documentary evidence of the amount of the total debt was ever produced. We attach little or no weight to Apel's latter day inconsistent statements at the trial and are satisfied that his statement in 1974, when his memory and recollection of the events were fresher, was more accurate. We thus sustain respondent's determination that petitioner's indebtedness to Apel was only $60,000 as of December 31, 1972. Petitioner next contends that his outstanding obligation as of December 31, 1972 to make future capital contributions of $400,000 and $315,000 to Pallister and Running M, respectively, should have been listed as separate liabilities *519 in respondent's net worth computation. We reject this contention. In listing petitioner's investments in Pallister and Running M on his net worth schedule, respondent simply netted the asset and liability figures. Instead of listing the full amount of petitioner's total capital contributions as separate assets and his total liabilities thereon as separate liabilities, respondent started with petitioner's pledged capital contribution to each, reduced these amounts by his unpaid capital obligations to each and his share of partnership losses from each, and included a single net figure for each partnership as an asset in the net worth schedule. Respondent's method is a proper accounting method to use in computing petitioner's investment in the partnerships, and achieves the same result that would flow from the other method of listing both total asset and total liability figures. Thus, petitioner's liability to make future capital contributions is in fact reflected in respondent's net worth computations, and any contention that such obligations should again be reflected as separately-stated liabilities is meritless. To do what petitioner asks us to do would provide petitioner with *520 a double benefit from the same liability. Petitioner next contends that respondent erred in including the amount of $106,923.73, representing prepaid legal expenses for various entities or business activities with which petitioner was involved, as an asset in petitioner's net worth schedule. This figure was computed directly from client account ledgers supplied to respondent's agents by Mr. Patmon, one of petitioner's attorneys. Petitioner does not appear to object to the amount of such prepaid legal expenses, nor deny that they were in fact paid to the law firm. Instead, petitioner's objection, as best we can understand it, seems to center around the fact that such amounts were computed from client account ledgers rather than from banking statements for Patmon-Young's trust account. Petitioner cites no authority to support his position, and absent a denial that such amounts were in fact paid during the year, we are unable to conclude that respondent erred in including the amount of $106,923.73, computed from the client account ledgers, as an asset in petitioner's net worth schedule. This was an expenditure by petitioner that resulted in his acquisition of an asset, namely prepaid *521 legal expenses. We conclude that it was properly included in the net worth computation. From the above, it is clear that respondent's net worth computation meets the first prong of the Holland test: that the opening net worth be established with reasonable certainty. Petitioner's only allegation of error concerning the opening net worth concerns respondent's failure to list an amount as cash on hand for 1970. However, for reasons stated above, respondent was amply justified in concluding petitioner had an insignificant amount of cash on hand as of December 31, 1970. Petitioner having assigned no other allegations of error with respect to respondent's opening net worth, such amount has been established to a reasonable certainty. All other allegations of error concerning respondent's net worth computations relate to years subsequent to 1970 and have been rejected for reasons already stated above. It is equally clear that respondent's net worth computation also meets either alternative branch of the second prong of Holland. The vast majority of information used in the net worth computation was obtained from an exhaustive investigation of petitioner's financial affairs *522 by respondent's agents. Tax returns, utility records, telephone records, and banking records were examined. Representatives of loan companies, utility companies, family members, and others with whom petitioner had financial dealings were contacted in an effort to obtain as much information as possible concerning petitioner's financial affairs. Petitioner himself denied receipt of any gifts or inheritances during 1971 and 1972. Thus, it is clear that respondent's agents conducted a reasonable investigation of leads negating possible sources of nontaxable income. With respect to the alternative branch of the second prong, in 1977, petitioner was convicted of conspiracy starting in 1972 to violate Federal narcotics laws, conspiracy to import heroin, and distributing and causing to be distributed heroin. Thus, a likely source of unreported taxable income has also been established. Having concluded that respondent's net worth computation meets the standards set forth in Holland v. United States,supra, and United State sv. Massei,supra, we sustain respondent's determination that petitioner had unreported income for taxable years 1971 and 1972 in the *523 amounts of $25,883.87 and $369,080.64, respectively. II. Disallowance of Partnership Losses
For taxable years 1972 and 1973, respondent disallowed various deductions attributable to petitioner's interest in the Pallister and Running M partnerships. The disallowance of the Pallister losses arose from respondent's determination that the partnership returns prepared by the general partner, Ringler, for 1972 and 1973 were correct. Petitioner, as limited partner, also prepared and filed partnership returns for the Pallister partnership. Respondent disallowed any deductions on petitioner's 1972 and 1973 Pallister returns that either were not claimed on the Ringler returns or that exceeded in amount those claimed on the Ringler returns. Respondent's determination that the 1972 and 1973 Ringler returns were the correct returns for the partnership was not an arbitrary assumption. That determination was based on a careful examination of the Ringler returns, various books and records of the partnership, and interviews with the general partner and with the accounting firm that prepared such returns. Other than arguing that respondent improperly accepted the Ringler returns as accurate, *524 a conclusion with which we do not agree, petitioner has offered no evidence supporting his claim that the 1972 and 1973 Pallister returns he prepared should be accepted as the correct partnership returns. Indeed, petitioner's 1973 Pallister return indicates on its face that the figures used therein were mere estimates at best. Moreover, petitioner's own returns for both 1972 and 1973 indicated they were based only on the information then available to the return preparer, Patmon-Young. Accordingly, petitioner has failed to carry his burden of proof and respondent's determinations concerning the 1972 and 1973 Pallister losses are sustained. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Thus, petitioner's taxable income is increased by the amounts of $156,364 and $68,848.95 for his 1972 and 1973 taxable years, respectively. With respect to Running M, respondent's disallowance of partnership losses stems from respondent's adjustment of the cost basis of some cattle and horses owned by the partnership, as well as other adjustments to the depreciation schedule of such assets. As with the Pallister losses, other than *525 assign error to respondent's disallowance of such losses, petitioner has offered no evidence to support Running M's entitlement to such deductions. Petitioner has thus failed to carry his burden of proof with respect to this issue, and respondent's determinations concerning petitioner's losses from Running M for 1972 and 1973 are sustained. Welch v. Helvering,supra;Rule 142(a), Tax Court Rules of Practice and Procedure. Thus, petitioner's taxable income is increased by the amounts of $63,891.16 and $75,375.14 for taxable years 1972 and 1973, respectively. III. Fraud Addition
In his statutory notice of deficiency respondent also determined petitioner was liable for the addition to tax for fraud for 1971 and 1972 in the amounts of $5,137.04 and $203,931.27, respectively. On brief, respondent has conceded that the statute of limitations bars assessment and collection of the deficiency and addition to tax for petitioner's 1971 taxable year absent a finding that petitioner is liable for fraud for such year. [30]
*526 Section 6653(b)(1) provides, in part, that "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F. 2d 1272 (7th Cir. 1980); Stoltzfusv. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States,supra,398 F. 2d at 1004; *527 Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stonev. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra,53 T.C. at 105-106. *528 Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F. 2d 216, 220 (6th Cir. 1955). Under section 6653(b), the fraud addition attaches to the entire deficiency even though only a portion of the underpayment is due to fraud. Mensik v. Commissioner,supra,328 F. 2d at 150; Johnson v. United States,94 Ct. Cl. 345, 39 F. Supp. 103 (1941). See also Breman v. Commissioner,66 T.C. 61 (1976); Stewart v. Commissioner,66 T.C. 54 (1976). The language of section 6653(b)--"any part of any underpayment"--presupposes the existence of an underpayment. Absent an underpayment, there is nothing to which the fraud addition may attach. Sec. 6653(b). See Jenkins v. United States,313 F. 2d 624, 627 (5th Cir. 1963). Consequently, the existence of an underpayment is an element of the fraud that respondent must establish. See Hebrank v. Commissioner,81 T.C. 640, 642 (1983); *529 Stone v. Commissioner,supra,56 T.C. at 220. Although respondent need not prove the precise amount of the underpayment of tax, nonetheless, he still must prove that the taxpayer has, to some extent, underpaid his taxes. Otsuki v. Commissioner,supra,53 T.C. at 105. Moreover, in a case such as this where the fraud allegations are inextricably intertwined with the alleged omissions of income--both depending upon the accuracy of respondent's net worth determinations--we must be extremely careful so that we do not boot-strap a finding of fraud upon a taxpayer's failure to carry his burden of proof with respect to the underlying deficiencies. See Drieborg v. Commissioner,supra,225 F. 2d at 218; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,supra,53 T.C. at 106. See also George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F. 2d 900 (6th Cir. 1944). *530 As discussed at length above, respondent's net worth computation established substantial amounts of unreported income and consequent underpayment of taxes for 1971 and 1972. We next turn to the matter of fraudulent intent. In addition to the substantial amounts of omitted income, there are several other factors present in this case which have been labeled indicia of fraud or "badges of fraud" by this and other courts. Petitioner dealt extensively in cash and made several large purchases or down payments thereon with cash. Friedman v. Commissioner,421 F. 2d 658 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Gromacki v. Commissioner,361 F. 2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court. Assets were purchased or attempted to be purchased in the names of nominees in order to conceal the true ownership thereof. The use of nominees in such a manner is evidence of fraud. Wilson v. Commissioner,supra,76 T.C. at 635; Conforte v. Commissioner,74 T.C. 1160, 1202 (1980), affd. in part, *531 revd. in part, remanded in part, 692 F. 2d 587 (9th Cir. 1982). Cashier's checks purchased with funds provided by petitioner were issued in the names of Apel and petitioner's father, respectively, as remitters. Friedman v. Commissioner,T.C. Memo. 1968-145, affd. 421 F. 2d 658 (6th Cir. 1970). Finally, neither petitioner nor his attorney cooperated with respondent's agents during their investigation, failing to produce requested records of petitioner's income-producing activities, although claiming such records did in fact exist. Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Millikin v. Commissioner,298 F. 2d 830, 836 (4th Cir. 1962); Estate of Beck v. Commissioner,supra,56 T.C. at 363. Taken together, all of these factors are sufficient to carry respondent's burden of proving fraud by clear and convincing evidence. However, with the exception of petitioner's failure to cooperate in producing records, all of the specific indicia of fraud relate solely to events which occurred during petitioner's 1972 taxable year, not 1971. And even though respondent has established by *532 clear and convincing evidence the existence of an underpayment for both 1971 and 1972, such underpayment, in the absence of other indicia, is insufficient to show fraud. Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,supra;Stone v. Commissioner,supra.
Respondent's contention that petitioner's election to file a separate return for 1971 is evidence of fraud is tenuous at best. Simply stated, respondent has failed to adduce any evidence indicating petitioner's election was made with a fraudulent intent, and the conclusions respondent would have us draw therefrom would be mere conjecture. We agree with respondent that there are suspicious circumstances involving 1971. In 1970 petitioner had gross wages of slightly over $5,000 as a truck driver and in 1971 he reported wages of only slightly over $2,000 as an insurance salesman, and some $8,000 of income from an unidentified source. Also in 1971 petitioner began the process of acquiring assets and making investments. The 1971 Continental Mark III was acquired; he invested $2,000 in Many Ventures, *533 and he bought the first horse and trailer for cash of $3,120. However, his wife was a school teacher and had income and some of the money could have come from her. Mere suspicion as to 1971 does not prove fraud. Cirillo v. Commissioner,314 F. 2d 478, 482 (3d Cir. 1963); Green v. Commissioner,66 T.C. 538, 550 (1976). More importantly, the activities in 1971 simply do not compare in scope to the large purchases and investments and extensive cash dealings in 1972. In 1972 petitioner purchased another horse trailer for $7,550 in cash, purchased a ranch in Texas with a $100,000 cash down payment, paid $150,000 in cash for his investment in the Pallister partnership, purchased through his counsel a $150,000 certificate of deposit, purchased a 1972 Continental Mark IV, purchased an interest in the Running M partnership, and purchased a lake-side home with tennis court and swimming pool, paying some $69,000 of the purchase price in cash. Therefore, we find that respondent has failed to prove petitioner's underpayment of tax for 1971 was due to fraud within the meaning of section 6653(b), and accordingly, the fraud addition will be sustained only for *534 petitioner's 1972 taxable year. IV. Statute of Limitations
The statutory notice of deficiency pertaining to petitioner's 1971 taxable year was not mailed to petitioner until July 30, 1976, more than three years after petitioner filed his 1971 return. Thus, absent an exception, both assessment and collection of the deficiency for petitioner's 1971 taxable year are barred by the statute of limitations. Sec. 6501(a). The only such exception relied upon by respondent is that found in section 6501(c)(1), relating to the filing of a fraudulent return with the intent to evade tax. See n. 30, supra. Respondent has expressly conceded that absent a finding of fraud, assessment or collection of the deficiency for petitioner's 1971 taxable year is time barred. Accordingly, respondent having failed to establish petitioner's 1971 return was fraudulent, the deficiency for that year may not be assessed. To reflect the foregoing, Decision will be entered for the petitioner for 1971 and for the respondent for 1972 in docket No. 9797-76.
Decision will be entered for the respondent in docket No. 202-78.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. ↩
2. On brief, petitioner raised an issue as to the statute of limitations for the year 1972. The pleadings in this case did not raise any limitations issue for 1972, and the Court need not address the matter. However, the facts of record show that the statutory notice of deficiency was mailed within three years of the filing of the 1972 return. See n. 14, infra.
In addition to the issues listed in the text above, the petition also placed in issue respondent's disallowance of a loss deduction arising from petitioner's sale of some automobiles, the disallowance of petitioner's claimed personal exemption with respect to his wife (Evelyn J. Meredith), and the disallowance of petitioner's claimed standard deduction. Petitioner having produced no evidence to support these claimed deductions, we deem petitioner to have conceded these issues. Further, the statutory notice of deficiency pertaining to petitioner's 1973 taxable year disallowed a claimed section 1231 loss in the amount of $99,865, disallowed a claimed farm loss in the amount of $177,755, and increased petitioner's taxable income by $3,431.81, representing the alleged net capital gain resulting from the sale of a portion of petitioner's interest in the Pallister partnership. Petitioner having failed to allege error with respect to such proposed adjustments either in the petition (other than a general challenge to all of the adjustments in their entirety) or at trial, we likewise deem such adjustments to have been conceded by petitioner. If not conceded, then petitioner failed to carry his burden of proof in regard to those adjustments for 1973.↩
3. We note that in August of 1970, a 1970 Honda motorcycle was purchased and titled in his wife's name. The record also indicates a few other assets were possibly acquired in the latter part of 1970. However, it is clear that the vast majority of the assets were acquired beginning in the latter part of 1971 and lasting through at least 1972.↩
4. The Court is satisfied that the senior Mr. Meredith was only a figure head with respect to Many Ventures, and had little or no knowledge about the company or its activities. The father seems to have permitted himself to be used in a number of petitioner's transactions without fully understanding what was involved.↩
5. Petitioner ultimately defaulted on these loans, and lost the M-59 land, which had secured the loan, through foreclosure proceedings. Although Apel testified he got that property and also the Harmony Lane property back in 1973, petitioner's 1973 tax return which was signed by petitioner on October 15, 1974↩ still listed his residence as Harmony Lane. Also, his petition filed in this Court in 1976 gave the Harmony Lane address as petitioner's residence. The Court is inclined to discount Apel's testimony insofar as it relates to the year of any foreclosure, particularly since the year was suggested in counsel's question rather than in the witness' independent testimony.
6. The cashier's check purchased by Apel was actually purchased with $35,000 provided by petitioner and $15,000 provided by Apel. This $15,000 was part of the total $150,000 loaned to petitioner by Apel during 1972 and 1973. The $50,000 the senior Mr. Meredith used to purchase the cashier's check in his name was actually given to him by Frederick A. Patmon, one of the attorneys representing petitioner in this proceeding, as well as in other matters. The record is clear that the $50,000 did not belong to petitioner's father, and we are satisfied that the money did not belong to Mr. Patmon but had previously been given to Mr. Patmon by petitioner. ↩
7. We note that while the purchase agreement contemplated that the promissory note be in the face amount of $270,000, the face amount of the note actually executed was $300,000. The parties have not focused on this discrepancy and we attach no significance thereto.↩
8. Presumably this check was used to partially satisfy petitioner's obligation to pay Kleas $170,000 before January 15, 1973.↩
9. The forfeiture provisions were as follows: ↩
Date (Subject
Percentage Reduction
Aggregate Amount
to certain
(Applied to present
of Installment
conditions)
Percentage Interest)
$ 87,500
2/01/73
24%
$ 87,500
8/01/73
24%
$225,000
2/01/74
48%
10. While the Amended Agreement contained provisions which would have allowed the partnership to attempt to characterize payments to the partners as salary and to attempt to deduct such payments from the partnership's income, the partners intended the payments in question to constitute payments in exchange for their limited partnership interest purchased by petitioner. In fact, the full amount of petitioner's capital contribution was viewed by all of the parties as the purchase price of such limited partnership interests.↩
11. Petitioner also entered into a purported amendment of the partnership agreement and assignment of 69 percent of Pallister's losses, credits or other deductions to Walter Robinson on January 2, 1973, apparently without the knowledge of Pallister's other partners. The parties have raised no issue regarding the effect of this purported amendment and assignment, and we treat such assignment as valid for purposes of this opinion.↩
12. The record contains no evidence as to stock ownership of Running M Cattle Company, Inc. ↩
13. The record indicates several suspicious circumstances concerning Running M. For example, although petitioner's father-in-law is listed as a limited partner thereof, the Schedule K-1 pertaining to Mr. Gholson and accompanying the partnership return (Form 1065) filed for Running M's initial year of 1972 shows that he has a zero percentage interest in the partnership's profits and losses. Further, at trial Mr. Gholson testified that he was never a partner in Running M, nor did he have any knowledge thereof. However, respondent has not challenged the validity of Running M as a partnership for Federal income tax purposes, and we will accept it as such for purposes of our opinion herein.↩
14. Petitioner originally requested an extension of time to file his 1972 return until August 15, 1973. His Application for Extension of Time to File (Form 2688) was rejected on July 19, 1973. However, a 10-day grace period within which to file his return was granted, allowing petitioner until July 29, 1973 to timely file his return. July 29, 1973 fell on a Sunday; therefore, petitioner was allowed until the next working day, Monday, July 30, to timely file his return. The return was mailed by Patmon-Young on July 30, 1973 and thus was timely filed on July 30, 1973 even though it was not received by the Internal Revenue Service Center until August 3, 1973. Sec. 7502. The 1972 return being filed on either July 30, 1973 or August 3, 1973, the statutory notice of deficiency mailed on July 30, 1976 was within the three-year limitations period of section 6501(a). In any event, the limitations issue for 1972 is moot in view of our holding on the fraud issue for that year.↩
15. Although the parties stipulated that Glass also prepared the 1972 partnership return for Running M, the original return is in the record and bears the Patmon, Young & Kirk Professional Corporation stamp as the preparer.↩
16. The return reported depreciation of $94,655, repairs of $3,466, and "other expenses" of $177,816. The "other expenses" were further broken down on a separate schedule attached to the return, and consisted of the following items: Utilities
$ 10,890
Salaries
7,852
Rent-up fees
13,920
Insurance
434
Payroll taxes
1,084
Legal & accounting
2,411
Office expense
436
Management fee
13,549
Miscellaneous expense
1,428
Mortgage insurance premium
19,649
F.H.A. examination fee
5,817
Financing fee
58,210
Property tax
42,136
$177,816
The sum of these three items $ (275,937) exceeded the reported rental income of $188,137, producing the claimed net operating loss of ($87,800) for the year. ↩
17. Due to the default on his obligation to make additional capital contributions, petitioner had forfeited 48 percent of his partnership interest during 1973. Petitioner's 1973 Pallister partnership return showed his interest as 27 percent because of the assignment of 69 percent of Pallister's losses to Robinson. See n. 11, supra.↩
18. Accepting the total figure of $152,894 as accurate, the $857,621 claimed for financing and inspection fees is clearly a mathematical error. Assuming all other figures to be true, the total amount of financing and inspection fees must be $85,762 if all the figures are to total $152,894. ↩
19. We note that petitioner's 1973 Pallister return also contained a Schedule K-1 in the name of Walter Robinson, indicating that Robinson was entitled to 69 percent of Pallister's losses and allocating the amount of ($297,605) to Robinson as his distributive share of Pallister's losses for 1973. See ns. 11, 17, supra.↩
20. Petitioner also claimed a purported section 1231 loss in the amount of ($99,865) and claimed a farm loss in the amount of ($177,775) on his 1973 individual return (Form 1040). These losses have already been deemed conceded by petitioner. See n. 2, supra.↩
21. Mr. Feaster was called as a witness at the trial of this case but declined to testify, relying on his Fifth Amendment↩ rights.
22. At trial, Apel contradicted himself and said he thought the bulk of the $150,000 total was loaned to petitioner between May and December of 1972, and that such amounts probably exceeded $100,000 as of December 1972, although he could not specify the exact amount of the loan outstanding as of that date. The Court is satisfied that Apel's memory and recollection of events were fresher and clearer in 1974 than at the trial many years later.↩
23. Although Special Agent Williams was aware that two partnership returns for Pallister's 1972 year had been filed--one by Ringler and one by petitioner--and that such returns were different in material respects, Special Agent Williams used the partnership return filed by petitioner in computing his investment in Pallister. This was done to give petitioner the "benefit of the doubt," presumably because respondent has the burden of proof in criminal fraud cases, and must prove the existence of criminal fraud "beyond a reasonable doubt."↩
24. Agent Bangela determined petitioner had purchased the cattle in 1972 for $160,000. Petitioner then sold the cattle to Running M one month later for the stated-purchase price of $385,000. The record does not indicate whether such purchase price was actually paid to petitioner. ↩
25. There were some other cattle owned by Running M that were not affected by this adjustment. In addition, Agent Bangela also made some adjustments concerning the cost basis of certain meres and foals owned by Running M. However, these adjustments were relatively minor compared to that concerning the sham-purchase transaction.↩
26. Other schedules and tables attached to and made part of respondent's net worth computation give detailed break-downs and explanations of the various asset and liability figures. Since no issue has been raised as to most of the items, our findings of fact and opinion are limited to those few as to which there is a dispute.↩
27. About a year before the trial of this case, the parties entered into the following stipulation: At no time did respondent conduct an examination or audit of the books and records of Pallister Plaisance Limited Dividend Housing Association and make any adjustments to distributable items or contributions to partners in the form of either adding additional income or disallowing deductions reflected on its form 1065, U.S. Partnership Return of income, for the calendar years 1971, 1972, and 1973 respectively, as signed by Mr. Paul Ringler. We think this stipulation is not inconsistent with our findings herein. No adjustments were made to the Pallister returns filed by Ringler. Rather, the adjustments were made to the Pallister returns filed by petitioner to the extent such returns were inconsistent with those filed by Ringler. Also Ringler's personal return was examined and adjusted because he had used estimates rather than the figures shown on the Ringler partnership returns. With that qualification, we accept the parties' stipulation as true. However, to the extent, if any, such stipulation implies that no examination of Pallister's books and records was made, we reject such interpretation, since the trial record clearly shows that various books and records of Pallister were in fact examined. We accept such stipulation only as to the fact that a full audit of the partnership books and records was not conducted.↩
28. Other adjustments to Running M's taxable income were also made, but petitioner having failed to allege error with respect thereto, they are not now in issue. ↩
29. In determining petitioner's distributive share of losses from Pallister, Agent Bangela adjusted petitioner's interest in such partnership to reflect both his assignment of a portion of his interest to Walter Robinson in January of 1973 and also his forfeiture of a portion of his interest therein due to his default in meeting his capital contribution obligation. See nn. 11, 17, 19, supra. Petitioner has not questioned Agent Bangela's recomputation of his interest in Pallister. Further, with respect to Running M, Agent Bangela allocated only 50 percent of the losses for the 1973 year to petitioner. The Schedule K-1 attached to Running M's 1972 return indicated that petitioner owned a 95 percent interest in partnership profits and losses. Petitioner has raised no issue with respect to this allocation for 1973, and we accept it as correct.↩
30. Respondent has not argued and we have not considered the applicability of the six-year statute of limitations under section 6501(e).↩